ELMORE, Judge.
 

 *785
 
 Christopher Michael Crook (defendant) appeals from his two consecutive sentences of thirteen to twenty-five months imprisonment, arguing that the trial court erred in denying his motion to suppress a statement he made prior to receiving
 
 Miranda
 
 warnings, erred in sentencing him as a prior record level II offender, and committed plain error in its jury instructions. We reverse in part, find no error in part, and vacate and remand for resentencing.
 

 I. Background
 

 The State's evidence tended to show the following: On 14 June 2013, Detective Daniel Barale with the Fletcher Police Department was patrolling the hotels and motels of the area. He parked at the Knights Inn Motel and was sitting in his vehicle when he saw a black Jeep pull in and park behind him. Detective Barale entered the license plate number into a program on his computer, which indicated that the license plate had been revoked and belonged to a Crown Victoria.
 

 *774
 
 Detective Barale then searched for the registered owner of the Crown Victoria via the computer program and learned that Nicholas Taylor, who had an active warrant out of Buncombe County, owned the car. Detective Barale testified that around the same time, "two younger white males came out [of the Jeep] and walked right in front of me." The computer program displayed a picture of Taylor with a neck tattoo, which allowed Detective Barale to identify one of the men who walked
 
 *786
 
 in front of his car as Taylor. Detective Barale also testified that one of the men had a large, fixed-blade knife on his belt. The men walked up the stairs on the outside of the motel and entered a motel room.
 

 After Detective Barale confirmed with dispatch that the Buncombe County warrant for Taylor was still active, he called for backup. A few minutes later, Officer Brian Fulmer arrived, and they knocked on the motel room door where Taylor and the other male had entered. Detective Barale knocked "a couple times," and announced, "Fletcher Police," but no one answered. Detective Barale testified that he could see through the blinds and observed Taylor and the other male sitting on the beds as well as a third person coming from the back of the room where the bathroom was located. Around that same time, Detective Barale retrieved a passkey from a maintenance worker to unlock the door, however, the chain on the inside was latched. Defendant opened the door, walked outside, and tried to shut the door behind him. Detective Barale told him "to get out of the way" and that "we had a warrant for arrest for one of the persons inside." Detective Barale testified that defendant "tried to turn around and go back inside. I grabbed him. And we started wrestling. I took him to the ground and handcuffed him." Detective Barale stated that he placed defendant under arrest for resisting his investigation.
 

 Detective Barale testified as follows:
 

 Q. Once you got handcuffs on him what did you do at that point?
 

 A. I first did a quick pat down of him. First off, I asked him to sit down and I checked on the other officer, because I knew he had two to deal with. Once I did that, I went back to [defendant] and I asked-I patted him down. I found scales in his pocket. I retrieved the scales. And I asked him did he have anything else on him.
 

 ...
 

 Q. And what was his response?
 

 MR. JOHNSON: Objection.
 

 THE COURT: Overruled.
 

 MR. JOHNSON: I would just like to renew it on-based on the pretrial motion and due process.
 

 THE COURT: Objection noted.
 

 Q. Well, let me ask. What did you ask the defendant again?
 

 *787
 
 A. I asked him if he had anything else on him.
 

 Q. And what was his response?
 

 A. "I have weed in the room."
 

 Q. And what did you do at that point?
 

 A. At that point once we made sure that the other two were not going to be an issue, I helped [defendant] to his feet, and we went into the room. There is a-there was a small table right next to the room and two chairs, and I sat him down right there on those chairs. I then went into the back area of the room where the bathroom is located to make sure there was nobody else and do a quick check and make sure there are no weapons anywhere within reach of [defendant]. When I entered the bathroom, the toilet seat was up, and there was leaves, green leaves, floating in the toilet bowl and a syringe. And there was another syringe-well, appeared to be another syringe at the bottom that sunk.
 

 Q. What did you do once you saw that?
 

 A. At that point I left it where it was. I went back and asked [defendant] to tell me-point to me where the weed was. He went in between the two beds to a nightstand, and there was a small jewelry box.
 
 [1]
 
 He opened the jewelry box and grabbed a plastic bag, like a Ziploc bag, and there
 
 *775
 
 were-that contained marijuana. He then tried to close the jewelry box very quickly. But before he did, I could see that there was more in the jewelry box, including at least one glass pipe that I could see and a small baggy that had-little small clear plastic bag that had some kind of white or light tan powder.
 
 [2]
 

 Q. What did you do once he tried to close that box?
 

 A. I sat him back down on the chair and seized the box.
 

 Q. What-once you seized the box what did you do?
 

 *788
 
 A. Looked in the box. And I believe there were actually two glass pipes in the box and two bags of marijuana, some, what we call, blunts which is an empty cigar that are used to smoke marijuana, stuff them with marijuana and smoke them. And I believe there was also one marijuana cigarette that was all ready to be smoked.
 

 Q. What did you do once you found those items in the jewelry box? Let me back you up. Who took you to that jewelry box?
 

 A. [Defendant] did.
 

 Q. And what did you do once you found those items in the jewelry box?
 

 A. I seized the jewelry box.
 

 Q. And what did you do at that point?
 

 A. At that point I believe I asked [defendant] what else in the room was his. I think he pointed to a backpack. And I went back to the bathroom to retrieve the evidence that was in the toilet bowl.
 

 Q. And this was the, I believe you said, green leafy substance and the syringe?
 

 A. Correct.
 

 Q. What did you do once you went in there to retrieve that?
 

 A. I got in there and I was looking for something that I could use to reach in the toilet bowl. Some hotels have those clear trash bag liners, I was looking for one of those I could put my hand in that and try to pick up stuff from the toilet bowl. So I looked up, and there was a towel rack that's facing right above the toilet. And on that I saw a wrapped toilet paper roll, and it was on its side about 45 degrees pointing to the wall. The end of it was wet. The wrapper around the toilet paper was wet. And I looked around and I saw that there was a clear plastic bag pointing-sticking out of it. And I looked at a little bit closer and I also saw it was [sic] light or white tan powder in that plastic bag.
 

 Q. And what did you do once you found that powder?
 

 *789
 
 A. I retrieved it.
 

 Q. What did you do at that point?
 

 A. At that point I came back to [defendant] and I read [defendant] his
 
 Miranda
 
 rights.
 

 Q. And what happened at that point?
 

 A. I asked [defendant], you know, who the powder belonged to, if he knew anything about it. He denied. I asked him if he had bought it or sold it-I believe the way I put it: Did you buy or sell anything to Mr. Dawkins and Mr. Taylor, the other two? And he said no.
 

 Detective Barale also found a wallet on the table where defendant was seated, which defendant admitted was his. The wallet contained two North Carolina driver's licenses: one in the name of Christopher Messer, and another in the name of Kyle Andre. When asked who they belonged to, defendant stated "it was his friends." Detective Barale also testified that defendant stated the Christopher Messer license was his own.
 

 Detective Barale placed defendant, who was handcuffed with his hands behind his back, in Officer Fulmer's patrol vehicle. Detective Barale testified that he saw defendant looking toward him, so he opened the car door and saw a small, folded piece of paper on the floorboard that contained a "very small amount of clear crystal."
 
 [3]
 
 When Detective Barale asked defendant what it was, defendant "denied knowing anything about it and told me that I had planted it in the vehicle." Officer Fulmer then transported
 
 *776
 
 defendant to the Henderson County jail for processing. Detective Barale presented the evidence from that day to a magistrate, who issued an order in the name of Christopher Messer. Additionally, defendant applied for and obtained an appearance bond in the name of Christopher Messer. Days later, on 17 June 2013, Officer Fulmer informed Detective Barale that the person he booked on 14 June 2013 was not Christopher Messer but was actually Christopher Crook.
 

 Defendant's evidence tended to show that when Officer Fulmer asked defendant what his name was, he stated, "Christopher Crook." Officer Fulmer testified that he called the name, "Christopher Crook," into dispatch, and that defendant never told him that his name was Christopher Messer.
 

 *790
 
 On 30 September 2013, defendant was indicted for the following charges: possession of methamphetamine, trafficking in heroin, two counts of identity theft, resisting a public officer, possession of a schedule IV controlled substance, possession of up to one half ounce of marijuana, and possession of drug paraphernalia. On 18 February 2014, defendant filed a motion to suppress statements defendant made while in custody and prior to receiving
 
 Miranda
 
 warnings.
 

 The matter came on for trial at the 10 March 2014 Criminal Session of Henderson County Superior Court. After a
 
 voir dire
 
 examination of Detective Barale, the trial court denied defendant's motion to suppress. The jury found defendant not guilty of possession of methamphetamine and not guilty of trafficking in heroin. Defendant pleaded guilty to possession of a schedule IV controlled substance, and the jury found defendant guilty of the remaining charges. On 14 March 2014, the trial court sentenced defendant to a term of thirteen to twenty-five months for one count of identity theft and to a consecutive term of thirteen to twenty-five months for the remaining convictions. Defendant filed a petition for writ of
 
 certiorari
 
 on 22 January 2015, which we allowed.
 

 II. Analysis
 

 A. Motion to Suppress
 

 Defendant argues that the trial court erred in denying his motion to suppress his statement, "I have weed in the room." Defendant states, "To the extent the trial court concluded that [defendant] was not in custody when Detective Barale questioned him, the trial court's conclusion was unsupported by the findings and the evidence." Moreover, the statement was made in response to Detective Barale's direct questioning.
 

 "The standard of review when appealing from a trial court's ruling on a motion to suppress is that 'the trial court's findings of fact are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting. The trial court's conclusions of law, however, are fully reviewable.' "
 
 State v. Evans,
 

 201 N.C.App. 572
 
 , 574,
 
 688 S.E.2d 25
 
 , 26-27 (2009) (quoting
 
 State v. Green,
 

 194 N.C.App. 623
 
 , 626,
 
 670 S.E.2d 635
 
 , 637 (2009) ).
 

 Here, the trial court found that the "officer was searching the defendant for his own safety and was not conducting an in-custody interrogation at that time." It concluded that the "officer was reasonable based on the particular circumstances of placing the defendant under arrest to inquire as to whether or not the defendant had any other objects on him. And the response of the defendant was voluntarily made, that the marijuana
 
 *791
 
 or weed, end quote, was the marijuana of the defendant." The trial court concluded that "this question asked by the officer prior to the
 
 Miranda
 
 rights being given to the defendant was not a custodial interrogation."
 

 In
 
 Miranda v. Arizona,
 
 the Supreme Court held, "[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."
 
 384 U.S. 436
 
 , 444,
 
 86 S.Ct. 1602
 
 , 1612,
 
 16 L.Ed.2d 694
 
 , 706 (1966). The Court explained, "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."
 

 Id.
 

 The North Carolina Supreme Court has likewise confirmed that "the rule of
 
 Miranda
 
 applies only where a defendant is subjected to custodial
 
 *777
 
 interrogation."
 
 State v. Gaines,
 

 345 N.C. 647
 
 , 661,
 
 483 S.E.2d 396
 
 , 404 (1997) (citation omitted).
 

 We have previously stated that "the determination of whether a defendant was in custody is a question of law, [and] it is fully reviewable here."
 
 State v. Fisher,
 

 158 N.C.App. 133
 
 , 145,
 
 580 S.E.2d 405
 
 , 415 (2003) (citing
 
 State v. Briggs,
 

 137 N.C.App. 125
 
 , 128,
 
 526 S.E.2d 678
 
 , 680 (2000) ),
 
 aff'd,
 

 358 N.C. 215
 
 ,
 
 593 S.E.2d 583
 
 (2004). In determining if a suspect is in custody, "the definitive inquiry is whether there was a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest."
 
 Gaines,
 

 345 N.C. at 662
 
 ,
 
 483 S.E.2d at
 
 405 (citing
 
 Stansbury v. California,
 

 511 U.S. 318
 
 ,
 
 114 S.Ct. 1526
 
 ,
 
 128 L.Ed.2d 293
 
 (1994) ).
 

 Here, as found by the trial court, immediately following the scuffle with Detective Barale, defendant was handcuffed behind his back and placed under arrest for resisting a public officer. Accordingly, because defendant was under formal arrest, he was in custody.
 
 Gaines,
 

 345 N.C. at 662
 
 ,
 
 483 S.E.2d at 405
 
 . The trial court erred inasmuch as it concluded defendant was not in custody.
 

 "[T]he trial court's determination of whether an interrogation is conducted while a person is in custody involves reaching a conclusion of law, which is fully reviewable on appeal."
 
 State v. Buchanan,
 

 353 N.C. 332
 
 , 336,
 
 543 S.E.2d 823
 
 , 826 (2001) (citing
 
 State v. Greene,
 

 332 N.C. 565
 
 , 577,
 
 422 S.E.2d 730
 
 , 737 (1992) ). In
 
 Rhode Island v. Innis,
 
 the Supreme Court discussed the meaning of interrogation and concluded that "the
 
 Miranda
 
 safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent."
 
 446 U.S. 291
 
 , 300-01,
 
 100 S.Ct. 1682
 
 , 1689-90,
 
 64 L.Ed.2d 297
 
 , 307-08 (1980). In this case, because Detective Barale asked defendant an express question, we need
 
 *792
 
 not determine whether Detective Barale's conduct amounted to the "functional equivalent."
 
 See
 

 id.
 

 at 301
 
 ,
 
 100 S.Ct. at 1689
 
 ,
 
 64 L.Ed.2d at 308
 
 (noting that the functional equivalent includes "any words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect");
 
 Fisher,
 

 158 N.C.App. at 142
 
 ,
 
 580 S.E.2d at 413
 
 .
 

 Here, after Detective Barale handcuffed defendant, placed him under arrest, and conducted a pat-down which led to the recovery of a digital scale, he expressly asked defendant, "Do you have anything else on you?" Defendant, in custody in front of the doorway to the motel room, stated, "I have weed in the room." Accordingly, because defendant was subjected to express questioning while he was in custody, under
 
 Miranda,
 
 he was entitled to procedural safeguards informing him of,
 
 inter alia,
 
 his right to remain silent. As defendant did not receive
 
 Miranda
 
 warnings, the prosecution was not permitted to use defendant's statement stemming from the custodial interrogation.
 
 Miranda,
 

 384 U.S. at 444
 
 ,
 
 86 S.Ct. at 1612
 
 ,
 
 16 L.Ed.2d at 706
 
 . Therefore, the trial court erred in concluding that defendant was not subject to custodial interrogation and in denying defendant's motion to suppress his statement.
 

 We disagree with the State's argument that the public safety exception established in
 
 New York v. Quarles,
 

 467 U.S. 649
 
 ,
 
 104 S.Ct. 2626
 
 ,
 
 81 L.Ed.2d 550
 
 (1984), applies. In that case, a woman approached two officers' patrol vehicle and informed them that she had just been raped, and that the man, whom she described to the officers, had just entered an A & P supermarket located nearby and was carrying a gun.
 

 Id.
 

 at 651-52
 
 ,
 
 104 S.Ct. at 2628-29
 
 ,
 
 81 L.Ed.2d at 554
 
 . The officers drove to the supermarket, spotted a man who matched the description, and pursued him as he ran toward the rear of the store.
 

 Id.
 

 at 652
 
 ,
 
 104 S.Ct. at 2629
 
 ,
 
 81 L.Ed.2d at 554
 
 . As one of the officers placed the man in custody, he noticed the man was wearing an empty shoulder holster, so he asked him where the gun was.
 

 Id.
 

 In holding that the state court erred in excluding the suspect's response to the question, the Supreme Court recognized "a narrow exception to the
 
 Miranda
 
 rule" when it concluded that "there is a 'public safety' exception to the requirement that
 
 Miranda
 
 warnings be given before a suspect's answers may be admitted into evidence[.]"
 

 *778
 

 Id.
 

 at 658, 655
 
 ,
 
 104 S.Ct. at 2632-33, 2631
 
 ,
 
 81 L.Ed.2d at 558, 557
 
 .
 

 The facts of this case are noticeably distinguishable from those in
 
 Quarles.
 
 Here, "the need for answers to questions" did not pose a threat to the public safety, outweighing the need for a rule protecting defendant's privilege against self-incrimination.
 

 Id.
 

 at 657
 
 ,
 
 104 S.Ct. at 2632
 
 ,
 
 81 L.Ed.2d at 558
 
 . Defendant was not suspected of carrying a gun or other weapon. Rather, he was sitting on the ground in handcuffs and he had already
 
 *793
 
 been "patted down," which produced only a digital scale. Moreover, in
 
 Quarles,
 
 immediately after securing the loaded revolver, the officer advised the suspect of his rights before continuing with "investigatory questions about the ownership[.]"
 

 Id.
 

 at 659
 
 ,
 
 104 S.Ct. at 2633
 
 ,
 
 81 L.Ed.2d at 559
 
 . In contrast, here, the officers conducted a full search of the motel room and posed further investigatory questions to defendant, including asking him to reveal everything he owned in the motel room, before ultimately reading him his rights. Accordingly, we reject the State's argument that the public safety exception should apply in this case.
 
 See
 

 State v. Crudup,
 

 157 N.C.App. 657
 
 , 661,
 
 580 S.E.2d 21
 
 , 25 (2003) (holding that the "circumstances in this case exceed the narrow scope of the public safety exception [as] [d]efendant was handcuffed[,] ... surrounded by three officers[,] and [t]here was no risk of imminent danger to the public, the officers, or even to the defendant").
 

 For the following reasons, defendant has established he was prejudiced by the trial court's error in refusing to exclude his statement. "A defendant is prejudiced by errors relating to rights arising other than under the Constitution of the United States when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises." N.C. Gen.Stat. § 15A-1443 (2015).
 
 [4]
 

 In
 
 State v. Phelps,
 
 this Court concluded that the trial court erred in admitting the defendant's statement because the officer failed to advise the defendant of his
 
 Miranda
 
 warnings prior to the custodial interrogation.
 
 156 N.C.App. 119
 
 , 123,
 
 575 S.E.2d 818
 
 , 821 (2003),
 
 rev'd,
 

 358 N.C. 142
 
 ,
 
 592 S.E.2d 687
 
 (2004). Nonetheless, we held that there was "no reasonable possibility that the exclusion of defendant's statement would have resulted in a different verdict."
 
 Id.
 
 at 124,
 
 575 S.E.2d at 822
 
 . Judge Hunter, dissenting in part, maintained that "the admission of defendant's statement to [the officer] that he had some crack in his coat pocket was highly inflammatory on the issue of whether defendant knowingly possessed the cocaine" and the State's evidence, excluding the defendant's statement, was "hardly overwhelming."
 
 Id.
 
 at 127,
 
 575 S.E.2d at 824
 
 (Hunter, J., dissenting in part). He wrote, "In fact, the only evidence
 
 *794
 
 against defendant is that cocaine, discovered as a result of a
 
 Miranda
 
 violation, was found inside the coat defendant was wearing. Thus, without the admission of defendant's incriminating statement, there is a reasonable possibility that the jury would have had reasonable doubt as to whether defendant knowingly possessed the cocaine and returned a different verdict."
 
 Id.
 
 at 127-28,
 
 575 S.E.2d at 824
 
 . Our Supreme Court reversed for the reasons stated in Judge Hunter's dissenting opinion.
 
 358 N.C. 142
 
 ,
 
 592 S.E.2d 687
 
 (2004).
 

 Here, like in
 
 Phelps,
 
 the State did not present "overwhelming evidence," excluding defendant's statement, which linked him to the marijuana and corresponding drug paraphernalia found in the same location. Defendant was acquitted of the charges for other drugs to which he did not admit ownership, two other people were in the motel room when officers arrived, and a fourth individual rented the motel room. Accordingly, there is a reasonable possibility that, had the error in question not been committed, a different result
 
 *779
 
 would have been reached at the trial. N.C. Gen.Stat. § 15A-1443.
 

 B. Jury Instruction
 

 Defendant argues, "The trial court erroneously gave peremptory instructions on both counts of identity theft that 'the driver's license of Christopher Michael Messer would be personal identifying information' when a driver's license does not qualify as 'identifying information' under the identity theft statute." Defendant contends that N.C. Gen.Stat. § 14-113.20(b)(2) states that "identifying information" includes only a driver's license
 
 number.
 
 Defendant claims that because "the instructions lessened the State's burden of proof and the evidence was conflicting, the erroneous jury instructions had a probable impact on the jury's verdicts."
 

 The State contends, "Defendant's argument fails to acknowledge that a North Carolina driver[']s license holder's driver[']s license number appears on an actual North Carolina driver[']s license." Alternatively, the State argues that "a driver[']s license is personal identifying information under N.C.G.S. § 14-113.20(b)(10) as '[a]ny other ... information that can be used to access a person's financial resources.' "
 

 "A defendant who does not object to jury instructions at trial will be subject to a plain error standard of review on appeal."
 
 State v. Oakman,
 

 191 N.C.App. 796
 
 , 798,
 
 663 S.E.2d 453
 
 , 456 (2008) (citing
 
 State v. Goforth,
 

 170 N.C.App. 584
 
 , 587,
 
 614 S.E.2d 313
 
 , 315 (2005) ); N.C. R.App. P. 10(a)(4) (2009). "For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial."
 
 State
 

 *795
 

 v. Lawrence,
 

 365 N.C. 506
 
 , 518,
 
 723 S.E.2d 326
 
 , 334 (2012). "To show that an error was fundamental, a defendant must establish prejudice-that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty."
 

 Id.
 

 (citation and quotation marks omitted).
 

 Defendant was charged with two counts of identity theft under N.C. Gen.Stat. § 14-113.20, which provides as follows:
 

 (a) A person who knowingly obtains, possesses, or uses identifying information of another person, living or dead, with the intent to fraudulently represent that the person is the other person for the purposes of making financial or credit transactions in the other person's name, to obtain anything of value, benefit, or advantage, or for the purpose of avoiding legal consequences is guilty of a felony punishable as provided in G.S. 14-113.22(a).
 

 (b) The term "identifying information" as used in this Article includes the following:
 

 (1) Social security or employer taxpayer identification numbers.
 

 (2) Drivers license, State identification card, or passport numbers.
 

 ....
 

 (10) Any other numbers or information that can be used to access a person's financial resources.
 

 N.C. Gen.Stat. § 14-113.20 (2015).
 

 As to the first count of identity theft, the trial court stated in pertinent part that "the driver's license of Christopher Michael Messer would be personal identifying information." Regarding the second count, the trial court stated that "the driver's license and Social Security number of Christopher Michael Messer would be personal identifying information."
 

 The evidence shows that defendant possessed Christopher Messer's driver's license in his own wallet. After defendant was arrested, Detective Barale entered Christopher Messer's driver's license number into the computer system so that the magistrate could issue arrest warrants in that name, and defendant accepted service of the arrest warrants in Christopher Messer's name. Defendant then used Christopher Messer's name, social security number, and driver's license number on his application for an appearance bond, which was accepted.
 

 *796
 
 In light of the overwhelming evidence presented, the jury instruction did not have a probable impact on the jury's verdict, and defendant cannot establish plain error. Christopher Messer's driver's license included the driver's license number. Moreover, even if failing to include the word "number" after "driver's license" in the instruction was error under N.C. Gen.Stat. § 14-113.20(b)(2),
 
 *780
 
 the driver's license constitutes "any other ... information that can be used to access a person's financial resources" under N.C. Gen.Stat. § 14-113.20(b)(10).
 

 C. Sentencing
 

 Defendant argues that the trial court erred by including the probation, parole, or post-release supervision point and sentencing him as a prior record level II offender because the State did not provide him with notice of intent under N.C. Gen.Stat. § 15A-1340.16(a6). Defendant contends this case is controlled by
 
 State v. Snelling,
 

 231 N.C.App. 676
 
 ,
 
 752 S.E.2d 739
 
 (2014).
 

 "The determination of an offender's prior record level is a conclusion of law that is subject to
 
 de novo
 
 review on appeal."
 
 State v. Bohler,
 

 198 N.C.App. 631
 
 , 633,
 
 681 S.E.2d 801
 
 , 804 (2009) (citing
 
 State v. Fraley,
 

 182 N.C.App. 683
 
 , 691,
 
 643 S.E.2d 39
 
 , 44 (2007) ). "It is not necessary that an objection be lodged at the sentencing hearing in order for a claim that the record evidence does not support the trial court's determination of a defendant's prior record level to be preserved for appellate review."
 

 Id.
 

 (citing
 
 State v. Morgan,
 

 164 N.C.App. 298
 
 , 304,
 
 595 S.E.2d 804
 
 , 809 (2004) ; N.C. Gen.Stat. § 15A-1446(d)(5), (d)(18) ).
 

 Pursuant to N.C. Gen.Stat. § 15A-1340.14(b)(7) (2015), a trial court can assess one prior record level point "[i]f the offense was committed while the offender was on supervised or unsupervised probation, parole, or post-release supervision, or while the offender was serving a sentence of imprisonment [.]" The statute further states, " G.S. 15A-1340.16(a5) specifies the procedure to be used to determine if a point exists under subdivision (7) of this subsection. The State must provide a defendant with written notice of its intent to prove the existence of the prior record point under subdivision (7) of this subsection as required by G.S. 15A-1340.16(a6)." N.C. Gen.Stat. § 15A-1340.14(b).
 

 N.C. Gen.Stat. § 15A-1340.16 (a6) (2015), "Notice of Intent to Use Aggravating Factors or Prior Record Level Points," states,
 

 The State must provide a defendant with written notice of its intent to prove the existence of ... a prior record level point under G.S. 15A-1340.14(b)(7) at least 30 days before
 
 *797
 
 trial or the entry of a guilty or no contest plea. A defendant may waive the right to receive such notice.
 

 The State contends that "defendant's prior record level worksheet was made available to [him] in discovery on 8 August 2013, more than 30 days prior to the trial.... As such, the defendant was provided notice of his prior record level calculation of a prior record level II with two prior record level points [.]" The State also argues that by stipulating that he was a prior record level II offender for sentencing, with one sentencing point not related to a prior conviction, defendant "consented to the calculation and waived any notice requirements[.]" The State's position, however, has already been rejected by this Court in
 
 State v. Williams,
 
 No. COA11-1256, ---N.C.App. ----,
 
 723 S.E.2d 584
 
 ,
 
 2012 WL 1317821
 
 (N.C.Ct.App. Apr. 17, 2012).
 

 In
 
 Williams,
 
 the defendant filed a motion alleging that the State had failed to provide sufficient notice of its intent to attempt to establish the existence of a prior record point authorized by N.C. Gen.Stat. § 15A-1340.14(b)(7).
 
 Id.
 
 at *2. The trial court agreed, concluding, "[T]he prior record level worksheet that the State had provided to Defendant in discovery did not constitute written notice of the State's intent to prove that Defendant had committed the offense for which he was being sentenced while on probation."
 
 Id.
 
 This Court affirmed, stating, "At most, this prior record worksheet constituted a possible calculation of Defendant's prior record level and did not provide affirmative notice that the State intended to prove the existence of the prior record point authorized by N.C. Gen.Stat. § 15A-1340.14(b)(7) as required by N.C. Gen.Stat. § 15A-1340.16(a6)."
 
 Id.
 
 at *7. We noted that the State "had the ability to comply with the statute using regular forms promulgated for this specific purpose by the Administrative Office of the Courts."
 
 Id.
 
 (quoting
 
 State v. Mackey,
 

 209 N.C.App. 116
 
 , 121,
 
 708 S.E.2d 719
 
 , 722 (2011) ).
 

 *781
 
 In
 
 State v. Snelling,
 
 we held that the trial court erred in sentencing the defendant as a prior record level III because it failed to comply with N.C. Gen.Stat. § 15A-1340.16(a6).
 
 231 N.C.App. at 682
 
 ,
 
 752 S.E.2d at 744
 
 . Because the trial court did not determine if the statutory requirements of N.C. Gen.Stat. § 15A-1340.16(a6) were met, no evidence showed that the State provided notice of its intent to prove that probation point, and no evidence indicated that defendant waived his right to receive such notice, we found prejudicial error and remanded for resentencing.
 
 Id.
 
 at 682-83,
 
 752 S.E.2d at 744
 
 . As defendant points out, the defendant in
 
 Snelling
 
 also stipulated to his prior record level points, including one point for an offense committed while he was on probation.
 
 Id.
 
 at 678,
 
 752 S.E.2d at 742
 
 .
 

 *798
 
 Here, like in
 
 Snelling,
 
 the trial court did not determine that the State had provided notice of its intent to prove defendant committed the crimes charged while on probation, parole, or post-release supervision. Additionally, like in
 
 Williams,
 
 assuming that the State had included defendant's prior record level worksheet in discovery, such action does not constitute "written notice of its intent to prove the existence of ... a prior record level point under G.S. 15A-1340.14(b)(7)." N.C. Gen.Stat. § 15A-1340.16(a6). Moreover, no evidence shows defendant waived such notice.
 

 Acknowledging that
 
 Williams
 
 is not controlling legal authority as it is an unpublished case,
 
 [5]
 
 we decline the State's invitation to reach a different conclusion here. Moreover, we do not find merit in the State's distinction that unlike in
 
 Williams,
 
 the prior record level calculation here was "typewritten on the prior record level worksheet, rather than handwritten, which indicates permanency." The trial court erred by including the probation point in sentencing defendant as a prior record level II offender. This error was prejudicial because the additional point raised defendant's prior record level from I to II.
 

 III. Conclusion
 

 The trial court erred in denying defendant's motion to suppress his statement, "I have weed in the room." Accordingly, we reverse and remand for a new trial on the possession of marijuana and drug paraphernalia charges. The trial court did not commit plain error in its jury instructions on identity theft. The trial court committed prejudicial error by including the probation point in sentencing defendant as a prior record level II offender. Therefore, we vacate defendant's sentence, and we remand to the trial court for resentencing.
 

 REVERSED IN PART; NO ERROR IN PART; VACATED AND REMANDED.
 

 Judges McCULLOUGH and INMAN concur.
 

 [1]
 

 On cross-examination, Detective Barale noted that "he was handcuffed behind his back.... [He] was backing up to ... [the] jewelry box ... so he could use his hands."
 

 [2]
 

 The powder was later identified as heroin.
 

 [3]
 

 The crystal was later identified as methamphetamine.
 

 [4]
 

 See
 

 United States v. Patane,
 

 542 U.S. 630
 
 , 636,
 
 124 S.Ct. 2620
 
 , 2626,
 
 159 L.Ed.2d 667
 
 , 674 (2004) (holding that "the
 
 Miranda
 
 rule is a prophylactic employed to protect against violations of the Self-Incrimination Clause");
 
 Oregon v. Elstad,
 

 470 U.S. 298
 
 , 309,
 
 105 S.Ct. 1285
 
 , 1293,
 
 84 L.Ed.2d 222
 
 , 232 (1985) (discussing the prophylactic
 
 Miranda
 
 procedures);
 
 State v. Goodman,
 

 165 N.C.App. 865
 
 , 868-69,
 
 600 S.E.2d 28
 
 , 30-31 (2004).
 
 But see
 

 Dickerson v. United States,
 

 530 U.S. 428
 
 , 444,
 
 120 S.Ct. 2326
 
 , 2336,
 
 147 L.Ed.2d 405
 
 , 420 (2000) (holding that "
 
 Miranda
 
 announced a constitutional rule").
 

 [5]
 

 See N.C. R.App. P. 30(e)(3) ("An unpublished decision of the North Carolina Court of Appeals does not constitute controlling legal authority.").