**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: _____**

**Filing Date: August 14, 2014**

**Docket No. 32,891**

**STATE OF NEW MEXICO,**

   **Plaintiff-Appellee,**

**v.**

**RENE HERMOSILLO,**

   **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF LEA COUNTY**
**Gary L. Clingman, District Judge**

Gary K. King, Attorney General
Becca Salwin, Assistant Attorney General
Santa Fe, NM

for Appellee

Templeman & Crutchfield, P.C.
C. Barry Crutchfield
Lovington, NM

for Appellant

## OPINION

**GARCIA, Judge.**

{1}     Defendant, a probationer, pled no contest to trafficking controlled substances and delivery or manufacture of drug paraphernalia, reserving the right to appeal from the district court's denial of his motion to suppress. In this opinion, we determine whether Defendant's Fifth Amendment rights were violated when he was not given the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966), while handcuffed and questioned in his home by his probation officer during a random home visit. We hold that, under the specific facts of this case, Defendant was not "in custody" for Fifth Amendment purposes and,

1

therefore, no *Miranda* warnings were required. We affirm the district court's denial of Defendant's motion to suppress.

## A.     Standard of Review

**{2}**     In conducting our review, "we bear in mind that there is a distinction between factual determinations which are subject to a substantial evidence standard of review and application of law to the facts, which is subject to de novo review." *State v. Munoz*, 1998-NMSC-048, ¶ 39, 126 N.M. 535, 972 P.2d 847 (alteration, internal quotation marks and citation omitted); *see State v. Nieto*, 2000-NMSC-031, ¶ 19, 129 N.M. 688, 12 P.3d 442 (reviewing de novo whether a defendant is subject to a custodial interrogation). In other words, "[w]e determine whether the law was correctly applied to the facts, viewing the facts in the light most favorable to the prevailing party[,] . . . indulg[ing] in all reasonable inferences in support of the [trial] court's ruling and disregard[ing] all evidence and inferences to the contrary." *State v. Bravo*, 2006-NMCA-019, ¶ 5, 139 N.M. 93, 128 P.3d 1070.

## B.     Background and Procedural Facts

**{3}**     Although Defendant challenges the district court's conclusions, he does not argue that the district court's findings were not supported by substantial evidence. In accordance with the standard of review, we accept the district court's findings, as follows, and view them in the light most favorable to the State.

**{4}**     Defendant was on supervised probation after pleading no contest to possession of a controlled substance (felony—narcotic drug), resisting, evading or obstructing an officer (refusal to stop), and reckless driving in Lea County District Court Cause No. D-506-CR-2012-086. Defendant's supervising probation officer went over the probation order with Defendant, who acknowledged that he read and understood it, initialing each paragraph. The district court judge signed the probation order, and it was filed in the district court. Under its terms, among other things, Defendant was required: (1) to report to his probation officer as often as required; to submit completed and truthful reports; and to be truthful, accurate, and prompt in all communications with his probation officer; (2) not to associate with any persons having a criminal record or other probationers and parolees; and (3) to permit his probation officer to visit him at home or his place of employment at any time; and to permit a warrantless search of his person, automobile, and residence, if the probation officer has reasonable cause to believe the search would produce evidence of a probation violation. In addition, as part of the probation intake process, Defendant entered into a "rules for home visits" agreement, agreeing among other things: (1) to promptly answer the door and invite the officers in; and (2) to be courteous and cooperative with the officers.

**{5}**     On the evening of October 18, 2012, the probation officer was conducting home visits of various probationers under his supervision. Defendant's home was not originally on the list but was added because Defendant had recently been testing positive for drugs. The probation officer routinely has law enforcement officers accompany him on evening/night

home visits, and on this evening he was accompanied by a drug task force officer.

**{6}** The probation officer and drug task force officer went to Defendant's front door and knocked. The probation officer saw Defendant look out a window and observe the probation officer, then disappear. The probation officer heard activity in the house, and he became suspicious when Defendant did not promptly answer the door and decided he would search Defendant's residence for evidence of a probation violation. The probation officer continued to knock and announce his presence, and after a while Defendant's wife answered the door and let the officers inside. The probation officer found that Defendant had gone into a bathroom and locked the door. When he knocked on the bathroom door and announced his presence, Defendant refused to come out, saying he was going to the bathroom. During a quick and cursory protective sweep, the officers saw a known felon and fellow probationer leaving through the back door. The officers stopped this person who said that he and Defendant had been drinking beer in Defendant's house.

**{7}** After a while, Defendant came out of the bathroom. Defendant was searched, and $580 cash was found on his person. The probation officer became suspicious because Defendant had previously reported his income was less than that amount. "As a result of what had transpired and the uncertainty of the situation, Defendant was immediately handcuffed for officer safety reasons." Defendant was ordered to sit down and remain there, but "was not placed under arrest." Defendant was not told of his right to remain silent or of his right against self-incrimination pursuant to *Miranda*.

**{8}** The probation officer asked the drug task force officer, in Defendant's presence, whether a drug dog was available to search Defendant's residence. Defendant admitted to drinking alcohol with the other probationer. Defendant then asked to talk privately with his probation officer "to explain himself" and led the officer into the laundry room. The probation officer saw empty beer cans in the trash basket, and Defendant again admitted to drinking alcohol with the other probationer. The probation officer told Defendant he intended to search the house and asked Defendant "if there was [anything] in his residence he was not supposed to have." Defendant responded, saying, "Yeah, can I show you?" Defendant took the probation officer to a cabinet in the "party room" of his house, and said, "it's up there." The probation officer looked at the area Defendant referred to and observed what appeared to be drugs.

**{9}** The probation officer notified the drug task force officer of "what [he] had observed[,]" and the drug task force officer contacted another officer to obtain a search warrant. In the course of the search, it was confirmed that the probation officer had observed drugs, and the drugs were seized along with digital scales. Defendant was arrested and charged with trafficking a controlled substance and possession of drug paraphernalia.

**{10}** Defendant moved to suppress all statements he made while handcuffed, and all evidence that was seized as a result of the statements he made while handcuffed, arguing that he was interrogated while in custody without being advised of his *Miranda* rights. The State

3

responded. After conducting a hearing and entering findings and conclusions, the district court denied the motion to suppress. Defendant entered a conditional plea agreement reserving his right to appeal the denial of his motion to suppress. This appeal followed.

## C.      The *Miranda* Test

{11}     The Fifth Amendment protections provided under *Miranda* apply only to "custodial interrogation[s]." 384 U.S. at 444; *see State v. Smile*, 2009-NMCA-064, ¶ 24, 146 N.M. 525, 212 P.3d 413. In determining whether a defendant is in custody for purposes of the Fifth Amendment, "the court must apply an objective test to resolve the ultimate inquiry:  was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest[?]" *State v. Wilson*, 2007-NMCA-111, ¶ 14, 142 N.M. 737, 169 P.3d 1184 (internal quotation marks and citation omitted). Because the *Miranda* test is an objective one, we do not consider the subjective beliefs of the defendant or the officer about whether the defendant was in custody. *Wilson*, 2007-NMCA-111 ¶ 14. Rather, we consider "how a reasonable man in the suspect's position would have understood his situation." *Id.* (internal quotation marks and citations omitted). If no formal arrest occurred prior to questioning, our appellate courts engage in a fact-specific analysis of the totality of the circumstances under which the questioning took place in order to decide whether the custody requirement is met. *See, e.g.*, *Smile*, 2009-NMCA-064, ¶ 27. The following factors guide our inquiry: "the purpose, place, and length of interrogation[,]. . . the extent to which the defendant is confronted with evidence of guilt, the physical surroundings of the interrogation, the duration of the detention, and the degree of pressure applied to the defendant." *Munoz*, 1998-NMSC-048, ¶ 40 (internal quotation marks and citations omitted). In determining whether a person is being interrogated, we consider whether the officer's questioning is reasonably likely to elicit an incriminating response or has that effect. *State v. Ponce*, 2004-NMCA-137, ¶ 37, 136 N.M. 614, 103 P.3d 54.

## D.      The *Miranda* Test and Probationers

{12}     We have often noted that "[p]robation is the release by the court without *imprisonment* of an adult defendant convicted of a crime." *Id.* ¶ 8 (emphasis in original) (internal quotation marks and citation omitted). As such, probation is an act of clemency with the goal of education and rehabilitation, and it is not painless. *See State v. Donaldson*, 1983-NMCA-064, ¶ 32, 100 N.M. 111, 666 P.2d 1258. In order to effectuate a probationer's rehabilitation, a sentencing court may impose conditions that have as their objective the deterrence of further misconduct. *Ponce*, 2004-NMCA-137, ¶ 8. As a result, probation status significantly reduces a probationer's expectation of privacy. *See, e.g.*, *State v. Baca*, 2004-NMCA-049, ¶ 42, 135 N.M. 490, 90 P.3d 509.

{13}     Although a probationer does not lose the privilege against self-incrimination, the United States Supreme Court has refused to extend the requirements of *Miranda* warnings to prearranged routine probation interviews with probation officers. *See Minnesota v. Murphy*, 465 U.S. 420, 430 (1984) (holding that a probationer meeting with his probation

4

officer was not "in custody" for purposes of receiving *Miranda* warnings even though he was "subject to a number of restrictive conditions governing various aspects of his life," and "in custody for purposes of federal habeas corpus") (internal quotation marks and citation omitted). In *Murphy*, the defendant's confession to new crimes to his probation officer did not require *Miranda* warnings even though (1) the probation officer could compel the defendant's attendance and truthful answers; (2) the probation officer consciously sought incriminating evidence; (3) the defendant did not expect investigatory questions and could not seek counsel before the meeting; and (4) there were no other individuals present to guard against abuse or trickery. *Id.* at 431-32; *see United States v. Manning*, 2008 WL 4915991, *5 (N.D. Okla. 2008) (summarizing the circumstances under which the Supreme Court did not require *Miranda* warnings for the probationer in *Murphy* and holding that no *Miranda* warnings were required under such precedent and in this case where neither meeting of the probationer with his probation officer created the coercive environment or involved restraint, isolation, or threatening behavior sufficient to create a custodial situation). In holding that no *Miranda* warnings were required in *Murphy*, the United States Supreme Court emphasized that the incriminating statements were obtained in a prearranged routine probation interview that was not a custodial setting; there was no formal arrest or restraint on freedom of movement of the degree associated with a formal arrest; and the defendant was free to leave at the end of the meeting. *Murphy*, 465 U.S. at 430-31. In a footnote, the United States Supreme Court further emphasized that "[a] different question would be presented if [the defendant] had been interviewed by his probation officer while being held in police custody or by the police themselves in a custodial setting." *Id.* at 430, n.5.

**{14}** This Court applied the *Miranda* test in the probation context in *Ponce*. 2004-NMCA-137, ¶¶ 37-38. In that case, we held that the defendant probationer was not entitled to *Miranda* warnings because (1) he was interviewed at the probation office during a standard probation meeting, a setting that should not be characterized as unfamiliar or an interrogation environment; (2) although he was arrested upon arrival at the meeting, the arrest was not for independent criminal activity, but rather for noncriminal conduct that nevertheless was a violation of the defendant's probation conditions (the defendant had tested positive for alcohol under a no-alcohol probation condition); and (3) the probation officer's question about how the defendant arrived at the probation office was not designed to elicit an incriminating response or likely to have that effect. *Ponce*, 2004-NMCA-137 ¶¶ 37-38. Referring to the footnote in *Murphy* quoted above, we stated in *Ponce* that "the issue might be different if the defendant were under formal, custodial arrest" meaning, "an arrest for criminal activity in a custodial interrogation setting." *Ponce,* 2004-NMCA-137 ¶ 38.

**E.     Once Handcuffed, Was Defendant in Custody for Fifth Amendment Purposes?**

**{15}** Defendant argues that once handcuffed, he was in custody, and since he was subsequently interrogated without *Miranda* warnings, his responses must be suppressed. In responding to Defendant's arguments, we recognize this Court's methodology for analyzing the *Miranda* issue in *Wilson* to be useful and instructive. In *Wilson*, this Court examined the handcuffing of a defendant during a traffic stop, parsing the relevant Fourth Amendment

inquiry from the *Miranda*/Fifth Amendment inquiry in order to correctly apply the relevant legal tests to the facts.

### 1.    Handcuffing and Reasonableness Under the Fourth Amendment

**{16}**    In *Wilson*, when the defendant failed to cooperate with the traffic stop and acted defensively and threateningly, the officer used force to handcuff him, causing the defendant to drop to his knees, and then placed the defendant in the back of a police vehicle where he was questioned by police. 2007-NMCA-111, ¶¶ 3-4. We observed that the amount of force used by the officer was reasonable under a Fourth Amendment analysis and did not transform the traffic stop into a de facto arrest. *See Id.* ¶¶ 18-19, 35 (discussing the difference between Fourth and Fifth Amendment analysis and noting that the Fourth Amendment inquiry is one of reasonableness); *see also State v. Paananen*, 2014-NMCA-041, ¶¶ 19-25, 321 P.3d 945, *cert. granted*, 2014-NMCERT-003, 324 P.3d 376 (No. 31,982, Mar. 28, 2014) (discussing authorities that determine the objective indicia of formal arrest under the Fourth Amendment, including handcuffing for officer and public safety, and verbal notice to the suspect).

**{17}**    Under a Fourth Amendment analysis in this case, the probation officer acted reasonably in performing a pat down search of Defendant and handcuffing him when he came out of the bathroom. Handcuffing Defendant was objectively reasonable due to the "uncertainty of the situation" occasioned by Defendant's running and hiding and "for officer safety" purposes. Up to that point, Defendant had failed to comply with his obligation to cooperate with the home visit. In addition, no de facto arrest occurred at that point. *See*, *e.g.*, *State v. Lovato*, 1991-NMCA-083, ¶¶ 24, 32, 112 N.M. 517, 817 P.2d 251 (holding that officers used reasonable force in effectuating an investigatory detention and thus the stop did not amount to an arrest where the officers stopped a vehicle suspected in a recent drive-by shooting and, with guns drawn, ordered the occupants to exit the vehicle with the fingers laced behind their necks, then handcuffed the occupants). The probation officer testified that he told Defendant he was not under arrest, and the district court specifically found that when handcuffed, "Defendant was not placed under arrest." Defendant does not contend that this finding is not supported by substantial evidence. *See*, *e.g.*, *Paananen*, 2014-NMCA-041, ¶ 19 (discussing that exactly when an arrest has taken place is for the district court to determine in the first instance, and if contested on appeal, is reviewed for substantial evidence).

### 2.    *Miranda* Warnings Are Not Required During Routine Traffic Stops or Routine Probation Visits

**{18}**    In *Wilson*, we noted that "generally, routine traffic stops do not require that a detainee be given *Miranda* [Fifth Amendment] warnings before interrogation." *Wilson*, 2007-NMCA-111, ¶¶ 15, 20 (relying on *Berkemer v. McCarty*, 468 U.S. 420, 440-42 (1984); *see State v. Sanchez*, 2001-NMCA-109, ¶ 22, 131 N.M. 355, 36 P.3d 446; *Armijo v. State ex rel. Transp. Dep't*, 1987-NMCA-052, ¶ 6, 105 N.M. 771, 737 P.2d 552 (requiring

*Miranda* warnings only when a "defendant can demonstrate that, at any time between the initial stop and the arrest, he was subjected to restraints comparable to those associated with a formal arrest" (internal quotation marks and citation omitted)).

**{19}**    In this case, the probation order and home visits agreement required Defendant to fully cooperate with officers during home visits. *Murphy* informs us that a routine visit of a probationer by his probation officer, like a routine traffic stop, does not ordinarily present a Fifth Amendment situation that will be recognized as an in-custody interrogation. 465 U.S. at 430.

**3.    A Routine Stop for Questioning, not Requiring *Miranda* Warnings, may Evolve Into a Custodial Interrogation Situation**

**{20}**    In *Wilson*, we concluded that a routine traffic stop that initially did not require *Miranda* warnings subsequently evolved into a custodial interrogation equivalent to a formal arrest when the defendant was forcibly handcuffed, dropped to his knees, and then placed in a police vehicle for questioning. *Wilson*, 2007-NMCA-111, ¶ 35. In concluding that *Miranda* warnings were required, we relied on *United States v. Newton*, 369 F.3d 659, 675-76 (2d Cir. 2004). *Wilson*, 2007-NMCA-111, ¶¶ 32-33.

**{21}**    In *Newton*, the Second Circuit Court of Appeals concluded that the defendant-parolee was in custody for purposes of the Fifth Amendment when, based on a telephone call from the defendant's mother informing authorities that the defendant had a gun and was threatening to kill her and her husband, three parole officers and three police officers entered the defendant's home and immediately handcuffed him, even though the defendant was told that he was not being placed under arrest and that the handcuffs were being used only to ensure his own safety and that of the officers. 369 F.3d at 663-64. In so holding, the Second Circuit observed that "[h]andcuffs are generally recognized as a hallmark of a formal arrest." *Id.* at 676; *see also*, *United States v. Alvelo-Ramos*, 945 F. Supp. 19, *22 (D. Puerto Rico 1996) (during the execution of a search warrant of the defendant's house for illegal weapons, where five police officers were present and the defendant was handcuffed for the duration the defendant was in custody for purposes of *Miranda*).

**{22}**    In *Wilson*, we also discussed several New Mexico cases that buttressed our conclusion that the defendant was not in custody for Fifth Amendment purposes by noting that the defendant was not restrained or handcuffed during the police encounter. 2007-NMCA-111, ¶¶ 25-29; *see State v. Bravo*, 2006-NMCA-019, ¶ 11, 139 N.M. 93, 128 P.3d 1070 (holding that the defendant was not in custody in part because "[h]er movements were not restricted in any way by the officers" and she could move freely throughout her home during the interview); *Munoz*, 1998-NMSC-048, ¶ 43 (holding that the defendant was not in custody when he willingly went with police to be questioned, was not handcuffed or searched, was not interviewed in a locked space, and was taken back home when the interview was completed). Recently, we relied on *Wilson* in part to hold that the defendant was in custody for Fifth Amendment purposes, despite agreeing to meet with officers, when

he was handcuffed, transported in a police vehicle, and interrogated at the district attorney's office without handcuffs but under other conditions indicating restraint. *State v. Olivas*, 2011-NMCA-030, ¶¶ 11-12, 15, 149 N.M. 498, 252 P.3d 722.

**4.    Handcuffing Defendant did not Transform the Probationary Home Visit Into a Custodial Interrogation Situation**

**{23}**    Applying *Wilson* and *Olivas*, this Court must now determine whether *Miranda* warnings are required whenever a defendant-probationer is handcuffed while being questioned by his probation officer during a random home visit. Rather than embrace a bright-line rule, we consider the totality of the circumstances presented by the specific facts of the case. *See Olivas*, 2011-NMCA-030, ¶ 10 (stating that "our appellate courts engage in a fact-specific analysis of the totality of the circumstances under which the questioning took place in order to decide whether the custody requirement is met"). In considering the totality of the circumstances, we find *Murphy* and *Ponce* to be more instructive than *Wilson* and *Olivas.*

**{24}**    First, *Murphy* and *Ponce* directly address the application of *Miranda* in a probationary context. *Wilson* and *Olivas*, as well as the New Mexico cases discussed in *Wilson*, do not. In *Murphy*, the United States Supreme Court stated that "we decline to require [*Miranda* warnings] here since the totality of the circumstances is not such as to overbear a probationer's free will." *Murphy*, 465 U.S. at 431. It reasoned that the general obligation of probationers to appear and answer questions truthfully did not in itself convert the defendant's otherwise voluntary statements into compelled ones. *Id.* It also recognized that the nature of probation is such that probationers should expect to be questioned on a wide range of topics relating to their past criminality. *Id.* at 432. Further, the fact that the investigation was focused on the defendant as a suspect of a separate rape and murder did not trigger the need for *Miranda* warnings in a noncustodial setting. *Murphy*, 465 U.S. at 431. In *Murphy*, no *Miranda* warnings were required because the regular probation meeting presented a noncustodial setting and because the probationer was not arrested and was allowed to leave after the meeting. *Murphy*, 465 U.S. at 430, n.5.

**{25}**    In *Ponce*, the defendant probationer was immediately arrested for a violation of his probation agreement when he arrived at the probation meeting. 2004-NMCA-137, ¶ 2. While the *Ponce* opinion does not state that the defendant probationer was handcuffed when he was arrested, the defendant recognized that he was restrained to the degree associated with a formal arrest. This Court held that no *Miranda* warnings were required because the defendant was arrested for a noncriminal probation violation rather than for independent criminal activity, and the only issue preserved for review on appeal involved a question by an officer which was not designed to elicit an incriminating response. *Ponce*, 2004-NMCA-137 ¶¶ 37-38.

**{26}**    In the present case, Defendant's probation meeting was a random home visit rather than a regularly scheduled office visit. Although not prearranged, the visit took place in

Defendant's home, a noncustodial setting. Even though the date and time were not prearranged, random home visits are specifically authorized under the probation order and the home visit agreement, and a probationer accepts and expects that random home visits may occur in the ordinary course of probation. In this case, Defendant had already tested positive for drugs at previous office visits. Therefore, Defendant could reasonably expect that his probation officer might conduct a home visit to investigate these violations. Thus, the fact that the home visit was unscheduled does not, in and of itself, transform this case out of the ambit of *Murphy* and *Ponce* or otherwise automatically indicate that Defendant was in custody when the officers made their random home visit.

{27} Second, Defendant was not isolated or overwhelmed by the police presence. Defendant's wife and another probationer were at Defendant's house at the time of the visit. Even though a drug task force officer accompanied the probation officer, the district court specifically found that the officer was selected to accompany the probation officer that evening "because of his availability and county wide jurisdiction and not because of any expertise in dealing with drug offenses." The district court further found that the probation officer "was in charge of, directed and conducted the encounter" with minimal involvement from the drug task force officer, and that the probation officer's questions and conduct "were in furtherance of his duties. . . [and] the legitimate ends of his role" as Defendant's probation officer rather than as an agent of the drug task force. Under these circumstances, the presence of the drug task force officer does not mandate that Defendant was in custody for Fifth Amendment purposes. *See generally, State v. Bolin*, 2010-NMCA-066, ¶¶ 14-15, 148 N.M. 489, 238 P.3d 363 (observing that the presence of law enforcement officers does not alter the authority of a probation officer so long as the probation officer is acting "with a probationary purpose" rather than merely as "a subterfuge for criminal investigations").

{28} Third, the totality of the circumstances that occasioned the handcuffing of the defendants in *Wilson*, *Newton*, and *Olivas* on the one hand, and Defendant in this case, are quite different. In *Wilson*, the defendant was forcibly handcuffed and dropped to his knees, then immediately placed in the back of a police car for questioning. 2007-NMCA-111 ¶ 35. In *Newton*, in order to investigate parole violations that also constituted new crimes, six officers entered the defendant's home intending to arrest him, handcuffed him, and searched his home. 369 F.3d at 663-64. In *Olivas*, once the defendant agreed to meet with officers, they secured him in handcuffs at the rendezvous location and transported him in the back of a marked police car to the district attorney's office for questioning; the interrogating officers at the district attorney's office did not inform the defendant at any time that he was not under arrest or that he was free to leave the room or that he could terminate the interview by choice. 2011-NMCA-030, ¶¶ 11-12, 15. While at the district attorney's office, the defendant was not handcuffed but he was escorted at all times, including during smoke breaks outside the building; he was interrogated in a small room with the door closed and with two officers present at all times, one of whom sat between the defendant and the door; and the questioning officer interrogated the defendant by accusing him of the victim's murder and by repeatedly directing him to confess. *Id.*

9

**{29}** In this case, there is no evidence of force in relation to the handcuffing, or isolation in a secure location, or confinement as in *Wilson*, or of overwhelming police presence as in *Newton*, or of confinement and coercion as in *Olivas*. For identified safety concerns, Defendant was handcuffed when he came out of the locked bathroom and, in accordance with his home visits agreement, told to remain seated in a room of his home. Thereafter, Defendant demonstrated that he felt relatively unrestrained and familiar enough with his probation officer to ask to speak privately with the probation officer "to explain himself." Defendant then took the probation officer into another room of his house, the laundry room, where the probation officer saw empty beer cans in the trash can, and Defendant admitted to drinking alcohol with the other probationer. When the probation officer told Defendant he was going to search the house and asked Defendant if he had anything he was not supposed to have, the probation officer was continuing to investigate various probation violations and was proceeding in a reasonable manner. Defendant's admission and subsequent referral to a cabinet in the "party room" was not coerced in any manner and was the first instance that potentially transformed the home visit into an investigation of new unrelated criminal activity. Any Fifth Amendment protections arose after Defendant showed his probation officer the "party room" cabinet containing the drugs.

**{30}** The fact that Defendant was handcuffed does not automatically establish that he was in custody for Fifth Amendment purposes. Rather, the fact that Defendant was handcuffed is one of many factors that must be considered under the totality of the circumstances. In this case, the handcuffing exerted a level of restraint but was only utilized after Defendant created an insecure and problematic home visit environment. It was reasonable for the probation officer to temporarily restrain Defendant in order to obtain compliance with the terms and conditions of the probation order and the home visits agreement. As a result, the use of handcuffs on Defendant did not, by itself, rise to the level of an arrest or a custodial interrogation for Fifth Amendment purposes.

**{31}** It is also worth noting that the officers did not arrive at Defendant's home with the intention of threatening, coercing, or tricking Defendant into admitting to an unrelated and independent crime. At the outset, the probation officer knew Defendant had recently tested positive for drugs at prior office visits, and the home visit was specifically undertaken to investigate these prior violations. After Defendant ran and hid from the officers, their reasonable suspicions were justifiably heightened. When Defendant came out of the bathroom and the probation officer conducted a protective pat down and found a large amount of cash on Defendant, the officer's reasonable suspicions were justifiably heightened regarding potential drug use. At that point, the officer appropriately proceeded to ask the drug task force officer about the availability of a drug dog, and he told Defendant he intended to search the residence. Thus, the home visit evolved into an investigation of a probation violation that focused on the possession of drugs inside Defendant's residence. Coercion, threatening tactics, and tricks were not used to investigate Defendant's potential probation violations, including the possibility of drugs within Defendant's residence.

**{32}** As a result, the officer's actual question regarding whether "there was [anything] in

[Defendant's] residence he was not supposed to have" was objectively related to the home visit for probation violation purposes and was not specifically designed to elicit admission of an unrelated and independent crime. The probation officer did not accuse Defendant of possessing or trafficking in drugs and did not badger him into admitting such activity.

**F.      Conclusion**

**{33}**    Under the totality of the circumstances, Defendant was not in custody or formally arrested for Fifth Amendment purposes when he answered the question from his probation officer and escorted the probation officer to the drugs inside his home. Because the officers did not obtain the drugs and drug paraphernalia unlawfully, we do not address the application of the inevitable discovery doctrine. *See State v. Haidle*, 2012-NMSC-033, ¶¶ 9, 39, 285 P.3d 668 (stating that the inevitable discovery analysis is unnecessary unless we first determine that evidence was obtained through unlawful police conduct). Finally, because Defendant failed to develop and preserve his mere assertion on appeal that the New Mexico constitution was violated, there is no need to address this issue. *See State v. Quinones*, 2011-NMCA-018, ¶ 17, 149 N.M. 294, 248 P.3d 336 (declining to engage in the interstitial approach where the defendant failed to establish that the federal analysis is flawed, that there are structural differences between the state and federal governments, or that there are distinctive New Mexico characteristics warranting a departure from federal analysis).

**{34}**    We affirm the district court's order denying Defendant's motion to suppress.

**{35}    IT IS SO ORDERED.**

_____
**TIMOTHY L. GARCIA, Judge**

**WE CONCUR:**

_____
**CYNTHIA A. FRY, Judge**

_____
**J. MILES HANISEE, Judge**

11