# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: **March 5, 2018**

**NO. A-1-CA-34272**

**STATE OF NEW MEXICO,**

    Plaintiff-Appellee,

v.

**RONALD WIDMER,**

    Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Stan Whitaker, District Judge**

Hector H. Balderas, Attorney General
Santa Fe, NM
John Kloss, Assistant Attorney General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
C. David Henderson, Appellate Defender
Santa Fe, NM

for Appellant

**OPINION**

**VIGIL, Judge.**

{1} The district court denied Defendant Ronald Widmer's motion to suppress on grounds that inculpatory statements he made without the benefit of *Miranda* warnings were admissible under the police officer safety exception to *Miranda*. We disagree and reverse.

**BACKGROUND**

{2} Defendant was found guilty by a jury on one count of possession of a controlled substance (methamphetamine), contrary to NMSA 1978, Section 30-31-23 (2011). Defendant's conviction stemmed from the detention and search of his person that occurred during an Albuquerque, New Mexico Police Department (APD) investigation into whether a moped in Defendant's possession was stolen.

{3} Defendant filed a pre-trial motion to suppress statements he made, together with any drugs and paraphernalia seized from his person by the APD officers. Because Defendant's motion was untimely, the district court decided to address the merits of Defendant's motion during the trial, and together with any related constitutional issues as they arose while the evidence at trial was being presented.

{4} APD Officers Frank Baca and "Speedy" Apodaca, as well as APD forensic scientist Manuel Gomez testified. In addition, Defendant provided limited testimony

outside of the presence of the jury. APD dispatch received an anonymous tip reporting two individuals in a Walgreens parking lot were trying to start a moped that appeared to have been tampered with, and Officers Baca and Apodaca were dispatched to investigate. Upon arriving at the Walgreens at around 11:00 p.m., Officer Apodaca testified that he approached Defendant and his companion, Lydia Alvarez, who were standing around a moped meeting the tip's description, and asked what was going on and what were they doing. Defendant and Ms. Alvarez, according to Officer Apodaca, cooperated with the officers and explained that their moped was having mechanical issues due to a low battery. Although Defendant told the officers that he owned the moped, Officer Apodaca said they continued to investigate because there was damage to the moped's ignition, which indicated that it may have been stolen.

{5}     Officer Apodaca located a VIN number on the moped and ran that information through the National Criminal Information Center (NCIC)—a database through which police run checks on potential stolen vehicles, firearm inquiries, and warrant checks. At the same time, Officer Baca collected and ran the personal information of Defendant and Ms. Alvarez through NCIC and learned that Defendant had a possible active felony arrest warrant.

{6} As soon as the officers learned of the possible arrest warrant, within only minutes of arriving at Walgreens, and before receiving confirmation from dispatch that the arrest warrant was in fact active, Officer Apodaca detained Defendant, placed him in handcuffs, and directed him to sit near the sidewalk.

{7} While Defendant was being handcuffed, Officer Apodaca searched Defendant's person. During the search and without reading Defendant his *Miranda* rights, Officer Apodaca asked Defendant "Is there anything else on you that I should know about?"—which both officers testified is a routine question asked of individuals being patted down to ensure police safety. In response to Officer Apodaca's question, Officer Baca testified over defense counsel's objection (which was overruled) that Defendant admitted to having some methamphetamine in a red pill container hanging from his belt loop. As a result, Officer Apodaca seized a pill container which contained a white powdery substance from Defendant's belt loop. Shortly thereafter, APD dispatch confirmed that the arrest warrant for Defendant was outstanding and Defendant was placed in Officer Apodaca's squad car and removed from the scene.

{8} The district court gave two explanations for its ruling admitting Defendant's statement into evidence. The district court ruled that Defendant's questioning was permissible as incident to a lawful arrest under the police safety exception to *Miranda*. In a subsequent statement, the district court further explained that it refused

to "get into the artfulness or lack of artfulness" of Officer Apodaca's question to Defendant. The jury was instructed that:

> Evidence has been admitted concerning a statement allegedly made by [D]efendant. Before you consider such statement for any purpose, you must determine that the statement was given voluntarily. In determining whether a statement was voluntarily given, you should consider if it was freely made and not induced by promise or threat.

{9} Officer Apodaca further testified that during the investigation at Walgreens he and Officer Baca also spoke with Ms. Alvarez. As a result of this interaction, Officer Apodaca testified that he seized a small baggie containing a white powdery substance from Ms. Alvarez, which Officer Baca had noticed was underneath Ms. Alvarez's leg where she sat on the sidewalk. Believing that all of the white powder seized from Defendant and Ms. Alvarez was methamphetamine, Officer Apodaca combined the contents of the pill container from Defendant's belt with the contents in the baggie seized from Ms. Alvarez into one bag before tagging it into evidence.

{10} Mr. Gomez, who was qualified as an expert in forensic science and analysis of controlled substances, testified that a single sample of the contents of the bag containing the mixed white powders seized from Defendant and Ms. Alvarez was tested for controlled substances. This sample tested positive for methamphetamine.

{11} The jury returned a general verdict of guilty, and Defendant appeals.

4

## DISCUSSION

## I.      Standard of Review

{12}     Appellate review of a motion to suppress under *Miranda* presents a mixed question of law and fact. *State v. Olivas*, 2011-NMCA-030, ¶ 8, 149 N.M. 498, 252 P.3d 722. We defer to the district court's findings of fact, if they are supported by substantial evidence, and apply de novo review to the application of the law to those facts. *State v. Nieto*, 2000-NMSC-031, ¶ 19, 129 N.M. 688, 12 P.3d 442. "Whether a defendant was subject to a custodial interrogation and whether a defendant's statements are voluntarily given are legal determinations that we review de novo." *Olivas*, 2011-NMCA-030, ¶ 8; *see Nieto*, 2000-NMSC-031, ¶ 19 (utilizing de novo review to determine whether a defendant was subject to custodial interrogation); *State v. Cooper*, 1997-NMSC-058, ¶¶ 25-28, 124 N.M. 277, 949 P.2d 660 (applying de novo review to determine if a confession was voluntary). Likewise, we review a district court's conclusion of law that the police officer safety exception to *Miranda* applies under a de novo standard of review. *See United States v. Newton*, 369 F.3d 659, 669 (2d Cir. 2004) (applying a de novo standard of review to the district court's legal conclusion  regarding the applicability of the public safety exception to *Miranda*); *United States v. Lackey*, 334 F.3d 1224, 1226 (10th Cir. 2003) ("Whether

[the] facts support an exception to the *Miranda* requirement is a question of law.”).

**II.     Analysis**

{13}     On appeal, Defendant argues that Officer Apodaca’s question to Defendant: “Is there anything on your person that I should know about?”—which prompted Defendant to state that he had some methamphetamine—was custodial interrogation in violation of his rights under the Fifth Amendment and *Miranda v. Arizona*, 384 U.S. 436 (1966). Defendant also contends Officer Apodaca’s question does not qualify under the police officer safety exception to *Miranda*. We agree with both contentions.

**A.     Custodial Interrogation Under Miranda**

{14}     The Fifth Amendment to the United States Constitution provides that “[n]o person shall be compelled in any criminal case to be a witness against himself.” U.S. Const. amend V. Based on this protection, the United States Supreme Court established in *Miranda* that the government may not use statements, whether exculpatory or inculpatory, stemming from “custodial interrogation” of a suspect, unless effective procedural safeguards have been followed to secure the suspect’s privilege against self-incrimination. 384 U.S. at 444 (holding that prior to investigatory questioning, a suspect “must be warned that he has [the] right to remain silent, that any statement he does make may be used as evidence against him, and that

6

he has a right to the presence of an attorney"). *Miranda* warnings are required when a suspect has been: (1) placed in custody, and then (2) subject to interrogation. *Id.*; *State v. Vasquez*, 2010-NMCA-041, ¶ 26, 148 N.M. 202, 232 P.3d 438. When a defendant is subject to custodial interrogation without *Miranda* warnings, any responses made to police during the course of the custodial interrogation are presumed compelled and must be excluded from evidence. *Oregon v. Elstad*, 470 U.S. 298, 317 (1985).

{15}    Therefore, we must determine if Officer Apodaca's question to Defendant concerning whether he had anything on him that Officer Apodaca should know about constituted "custodial interrogation." We consider the questions of whether Defendant was placed in custody and then subject to interrogation in turn.

{16}    To determine whether a suspect was placed in custody for purposes of *Miranda*, appellate courts engage in an objective inquiry under which the ultimate issue is whether a suspect was either formally placed under arrest or subject to restraint from freedom of movement to the degree normally associated with a formal arrest. *See State v. Wilson*, 2007-NMCA-111, ¶ 14, 142 N.M. 737, 169 P.3d 1184; *see also State v. Munoz*, 1998-NMSC-048, ¶ 41, 126 N.M. 535, 972 P.2d 847; *Yarborough v. Alvarado*, 541 U.S. 652, 653 (2004). Because the inquiry into *Miranda* custody is an objective one, the subjective beliefs of the suspect and police officer

7

concerning whether the suspect was in custody are immaterial. *See Wilson*, 2007-NMCA-111, ¶ 41. As a result, "[t]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Yarborough*, 541 U.S. at 653 (internal quotation marks and citation omitted); *see Wilson*, 2007-NMCA-111, ¶ 35 (holding that a suspect was in *Miranda* custody when the police handcuffed and placed him in a police vehicle); *see also New York v. Quarles*, 467 U.S. 649, 655-56 (1984) (holding that a suspect was in *Miranda* custody when he was handcuffed and surrounded by police officers, even though he had not yet been told he was under arrest); *United States v. Smith*, 3 F.3d 1088, 1097-98 (7th Cir. 1993) (holding that a suspect was in *Miranda* custody when the suspect was frisked, placed in handcuffs, and told to sit in a specific place).

{17} Defendant was in custody for purposes of *Miranda* at the time of the questioning that led to his admission to possessing methamphetamine. Almost immediately upon arriving at Walgreens and learning of a possible active arrest warrant for Defendant, Officer Apodaca detained Defendant and placed him in handcuffs. Officer Apodaca proceeded to frisk Defendant and directed him to sit down on the sidewalk. Although Officer Baca testified at trial that APD officers are not permitted to formally place a suspect under arrest until potential warrants have been confirmed by dispatch, Officer Apodaca testified that at the time Defendant was

8

placed in handcuffs "he was arrested for the warrant." However, whether Defendant's detention constituted an investigatory stop, a de facto arrest, or formal arrest is immaterial because a suspect need not be under formal arrest to be in "custody" under *Miranda*. Rather *Miranda* custody only requires restraint from movement to the degree normally associated with an arrest, as the courts in *Wilson*, *Quarles*, and *Smith* concluded. In those cases, the courts determined suspects were in *Miranda* custody when they were handcuffed, frisked, questioned, and ordered to sit in a particular area—even if not explicitly told they were under arrest—because the suspects' movement was restrained to the degree normally associated with an arrest. Here, Defendant's freedom of movement was similarly restrained when he was handcuffed, frisked, questioned, and ordered to sit on the sidewalk by Officer Apodaca. The circumstances indicate that a reasonable person in Defendant's position would have understood himself to be in custody.

{18}     Having determined that Defendant was placed in "custody" by Officer Apodaca for purposes of *Miranda*, we turn to whether Officer Apodaca's questioning of Defendant constituted "interrogation," under *Miranda*.

{19}     "Interrogation" under *Miranda* certainly encompasses express questions from police to obtain an incriminating response. But, it is not limited to such express questions. "Interrogation" also includes "any words or actions," according to the

9

United States Supreme Court, "that the police should know are reasonably likely to elicit an incriminating response[.]" *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980), (quoted in *State v. Ybarra*, 1990-NMSC-109, ¶ 11, 111 N.M. 234, 804 P.2d 1053). In this regard, because *Miranda* is designed to provide a suspect in custody with additional protection against "coercive police practices, without regard to objective proof of the underlying intent of the police[,]" the focus is primarily on the suspect's perception. *Rhode Island*, 446 U.S. at 301. "A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation" regardless of the police officer's actual intent. *Id*.

{20}     *State v. Spotted Elk*, 34 P.3d 906 (Wash. Ct. App. 2001) is illustrative. In *Spotted Elk*, a police officer saw a person he knew to be a drug user, and after confirming his suspicion that she had outstanding arrest warrants, arrested her. *Id*. at 908. Because he knew the defendant was a drug user, the officer was concerned that she might have weapons, needles, or drugs on her person, and he asked, before handcuffing and searching her incident to arrest, "Do you have anything on your person I need to be concerned about?" *Id*. Usually, but not this time, the officer's practice was to immediately explain, "[w]eapons, needles or anything that can poke me, stick me, of any kind?" *Id*. In response to the officer's question, the defendant removed a plastic container from her shirt pocket and told the officer that it was

10

heroin which belonged to a friend. *Id.* The Washington Court of Appeals concluded that given the broad nature of the officer's question (which lacked his usual explanation that he was looking for weapons, needles, or items that could poke or stick him), "he should have known his query was reasonably likely to elicit an incriminating response." *Id.* at 909. The court therefore concluded that the defendant was subjected to an interrogation under *Miranda*. *Spotted Elk*, 34 P.3d at 909.

{21} We find *Spotted Elk* persuasive and adopt its reasoning. Here, Defendant was confronted by two armed police officers, handcuffed, searched, and then ordered to sit on the sidewalk. After Defendant was handcuffed and while Officer Apodaca was in the process of searching Defendant, Officer Apodaca asked Defendant "Is there anything on you that I should know about?" This was a broad, unlimited question with no explanation that Officer Apodaca was asking only about items which could jeopardize his safety. From Defendant's perception, the "question" was tantamount to a demand by Officer Apodaca that Defendant disclose to him whether anything illegal was on Defendant's person. *See State v. Hermosillo*, 2014-NMCA-102, ¶ 11, 336 P.3d 446 ("In determining whether a person is being interrogated, we consider whether the officer's questioning is reasonably likely to elicit an incriminating response or has that effect."). An armed police officer who has just handcuffed a person and is in the process of searching that person who asks whether there is

11

anything on his person the officer "should" know about, should know that the police officer's question is likely to elicit an incriminating response. We therefore conclude that Defendant was subjected to interrogation under *Miranda*.

{22}     Because Defendant was subjected to custodial interrogation under *Miranda*, Defendant was entitled to being advised of his constitutional rights. It is undisputed that Defendant was *Mirandized* after the inculpatory statements were elicited from him by Officer Apodaca. As a result, unless the circumstances of Officer Apodaca's questioning of Defendant warrant application of an exception to *Miranda*, the district court erred in admitting Defendant's statement to Officer Apodaca that he had some methamphetamine. We proceed by considering the state's argument and district court's ruling that an exception to *Miranda* applies in this case.

**B.     The Police Officer Safety Exception to *Miranda***

{23}     In *Quarles*, the United States Supreme Court established a "narrow exception to the *Miranda* rule[,]" which allows arresting officers to ask a defendant "questions necessary to secure their own safety or the safety of the public." *Quarles*, 467 U.S. at 658-59 (1984). In *Quarles*, a woman reported that she had been raped at gunpoint and provided a description of her attacker. *Id*. at 651-52. When the officers entered a nearby supermarket and saw a man fitting the description provided by the woman, he fled. *Id*. at 652. Following a short pursuit, the officers caught him, frisked him, and

discovered that he was wearing an empty shoulder holster. *Id*. After handcuffing the suspect and before advising him of his *Miranda* rights, the officers asked the suspect where the gun was. *Quarles*, 467 U.S. at 652. He nodded towards some empty cartons and answered, "the gun is over there." *Id*. (internal quotation marks omitted). The Court reversed suppression of the defendant's statement and the firearm, holding that under circumstances where a question is "reasonably prompted by a concern for the public safety" or the safety of the arresting officers, *Miranda* warnings are not required. *Quarles*, 467 U.S. at 656, 658. The Court cautioned that under this "narrow exception," each case "will be circumscribed by the exigency which justifies it." *Id*. at 658.

{24}     In *State v. Trangucci*, 1990-NMCA-009, ¶¶ 6-13, 110 N.M. 385, 796 P.2d 606, this Court applied *Quarles*. In *Trangucci*, the defendant forced himself into the victim's apartment, and after the victim refused the defendant's repeated demands for money, the defendant shot the victim in the face and ran. 1990-NMCA-009, ¶ 3. The police learned early the next morning that the defendant was at a certain motel and went there to arrest him. *Id*. ¶ 4. After entering the room with their weapons drawn, the officers observed a man lying on one of the beds with his back towards the door, and then found the defendant hiding underneath a dresser table with his hands hidden under his chest. *Id*. ¶ 5. After lifting the dresser and while lifting the defendant to his

feet, one of the officers conducted a quick pat down of the defendant's front area and asked, "Where is the gun?" *Id*. Defendant, who was not yet handcuffed, immediately answered that the officer was not going to find the gun because he had ditched it. *Id*. Defendant was then given his *Miranda* warnings. *Trangucci*, 1990-NMCA-009, ¶ 5. On appeal, the defendant argued that the district court erred in denying his motion to suppress his statement regarding the gun. *Id*. ¶ 6. This Court observed that "[t]he standard for application of the public safety exception to *Miranda* warnings" under *Quarles* is "a reasonable determination of an objective, immediate threat to the safety of the public [or the police]." *Trangucci*, 1990-NMCA-009, ¶ 10. Because substantial evidence supported the district court's finding "that the situation had not stabilized or been secured for everybody's safety" when the defendant was questioned, this Court held that the district court properly denied the defendant's motion to suppress under the police and/or public safety exception to *Miranda*. *Trangucci*, 1990-NMCA-009, ¶ 13.

{25}     *Quarles* and *Trangucci* teach that a narrow exception to *Miranda* exists when there is an objective, immediate threat to police officer safety and police ask questions that are necessary to secure their own safety. In each case the exception "will be circumscribed by the exigency which justifies it." *Quarles*, 467 U.S. at 658.

14

Previously decided cases, similar to the one before us here, give us additional guidance.

{26}    In *Spotted Elk*, discussed above, after concluding that the police officer's question, "Do you have anything on your person I need to be concerned about?" was custodial interrogation under *Miranda*, the Washington Court of Appeals proceeded to consider whether the police officer safety exception applied. *Spotted Elk*, 34 P.3d at 908, 910. The court concluded it did not for two reasons: (1) "the officer's broad and apparently unqualified question was not related solely to his own safety"; and (2) "no sense of urgency attended the arrest." *Id*. at 910.

{27}    In *State v. Crook*, 785 S.E.2d 771 (N.C. Ct. App. 2016), a police officer was at a motel investigating whether the defendant and another suspect were in possession of a stolen vehicle, and received confirmation that the suspect had an outstanding warrant for his arrest. *Id*. at 773-74. After a backup officer arrived, the officers went to the room to arrest the suspect, where a wrestling match ensued when the defendant interfered with the suspect's arrest. *Id* at 774. A police officer handcuffed the defendant, ordered him to sit on the ground, and during his pat-down of the defendant found scales in the defendant's pocket. *Id.* After retrieving the scales, the officer asked him whether "he [had] anything else on him" and the defendant answered, "I have weed in the room." *Id.* The court rejected the state's argument that the public

safety exception to *Miranda* applied because there was no threat to the public safety which outweighed the need to protect the defendant's right against self-incrimination. *Crook*, 785 S.E.2d at 777-78. Specifically, the court noted, the defendant posed no threat to the police or public safety because he was not suspected of carrying a gun or weapon and was handcuffed, sitting on the ground when he was questioned. *Id.* at 778. The court therefore held that the defendant's motion to suppress his statement, "I have weed in the room[,]" should have been granted. *Id.* at 781.

{28} In *United States v. Castaneda*, 196 F.Supp.3d 1065 (D. Ariz. 2016), police officers approached the defendant because he violated a traffic law while riding his bicycle and because he appeared to be tryng to elude the officers. *Id*. at 1068. After it was discovered that the defendant had an outstanding misdemeanor warrant for failure to appear on a shoplifting charge, the defendant was handcuffed and arrested. *Id*. The officers also decided to retrieve the defendant's bicycle, which was ninety feet away and next to a storage shed. *Id*. One of the officers asked the defendant "if there was anything on the bicycle that he needed to know about." *Id*. One of the officers then heard the defendant say something about a joint and while taking the defendant to the patrol car, one of the other officers heard the defendant mumble that "he found something in the alley," that he thought it was a "rifle or something," and that it had "wood and screws." *Id*. The officers then found a sawed-off shotgun in a backpack

attached to the handlebars of the bicycle. *Id*. at 1068-69. The defendant was indicted for being a felon in possession of a firearm in violation of federal law. *Id*. at 1069. The court rejected the government's argument that the defendant's statements at the scene of his arrest were not subject to suppression under the police officer safety exception to *Miranda*. *Castaneda*, 196 F.Supp.3d at 1072-74. First, the court noted that there were no facts about the defendant, his conduct, or his arrest that gave rise to a potential threat or "a pressing need to ensure police and/or public safety." *Id*. at 1072-73. In addition, the court concluded that the nature of the question itself was "vague and investigative" because asking if there is "anything" the officer needs to know about "invites" a response "to list specific items of evidence or other incriminating information just as much as it addresses officer or public safety[.]" *Id*. at 1073. Such a question, the court held, "as opposed to a question strictly intended to resolve an officer's objectively reasonable immediate safety concerns cannot be excused by the *Quarles* exception." *Id*. at 1074.

{29}    We hold that under the facts of this case, Defendant's response to Officer Apodaca's question, "Is there anything else on you that I should know about" must be suppressed. This was a custodial interrogation without *Miranda* warnings, and the "narrow exception" recognized in *Quarles* does not apply. The officers expressed no concern of any kind that anything at the scene or Defendant's conduct posed a danger

to their safety. In fact, Defendant was cooperative and handcuffed before the pat down. If Officer Apodaca was concerned that Defendant might have something on his person which would endanger Officer Apodaca while he conducted Defendant's pat down, he did not say so. In addition, there is nothing in the record to show the reason for such a concern, if such a concern potentially existed. Similar to *Castaneda*, the broad, undifferentiated question, "Is there anything else on you I need to know about?" was not focused on protecting officer safety. 196 F.Supp.3d at 1073-74. As we have already observed, the question not only invited Defendant to disclose whether he had contraband of any kind on his person, dangerous or not, the officer expected Defendant to cooperate and answer the question. By continuing to cooperate with the officer, Defendant's only options were to give an answer that was dishonest or to incriminate himself. We require Defendant to do neither under these circumstances.

{30} We emphasize that our holding does not prohibit a police officer from asking a focused question that is necessary to ensure the safety of the officer when there is an objective, immediate threat to the safety of the officer. However, this is not such a case. We therefore determine that the district court erred in admitting Defendant's statement that he had some methamphetamine in a red pill container hanging from his belt loop, together with the methamphetamine discovered as a result of Defendant's

18

statement. *See State v. Greene*, 1977-NMSC-111, ¶¶ 31-32, 91 N.M. 207, 572 P.2d 935 (agreeing that "courts must be willing to bar the physical fruits of inadmissible statements and confessions, as well as the confessions themselves" under the "fruit of the poisonous tree" doctrine (internal quotation marks and citation omitted)).

**C.      Harmless Error**

{31}     Perhaps anticipating our conclusion, the State argues that even if *Miranda* was violated, admitting Defendant's statement into evidence was harmless error. We disagree.

{32}     At issue here is the violation of Defendant's constitutional rights under *Miranda*. *See Wilson*, 2007-NMCA-111, ¶¶ 35-36 (stating that federal constitutional rights arise from a *Miranda* violation). An appellate court may not conclude that a constitutional error is harmless unless the state carries its burden of demonstrating that the error is harmless beyond a reasonable doubt. *State v. Tollardo*, 2012-NMSC-008, ¶ 25, 275 P.3d 110. That is to say, the State must demonstrate that there is "no reasonable possibility" that the constitutional error affected the verdict. *State v. Barr*, 2009-NMSC-024, ¶ 53, 146 N.M. 301, 210 P.3d 198 (emphasis omitted), *overrruled on other grounds by Tollardo*, 2012-NMSC-008, ¶ 37.

{33}     With the denial of Defendant's motion to suppress, the defense strategy relied on other lapel videos recorded by the officers to challenge the State's claim that the

white powdery substance presented at trial was not seized from Defendant. Defense counsel argued that the methamphetamine presented at trial had actually been seized from Defendant's companion, Ms. Alvarez. In support of the defense, Defendant's attorney wanted to admit edited clips from Officer Apodaca's lapel cam video. However, because defense counsel had not yet edited the videos, and to avoid a delay in the trial to allow counsel to redact the videos, the district court ruled that to support the defense, defense counsel would be required to admit the full videos from Officer Apodaca and Baca's lapel cams, including the audio. On one of the videos, after the methamphetamine was seized from Defendant, one of the officers asked Ms. Alvarez if she had any methamphetamine, to which she responded, "What are you talking about?" As the officer was answering, "[t]he meth that's on [Defendant,]" Defendant told Ms. Alvarez, "[t]he meth that's on me baby."

{34}    The State makes two arguments of harmless error on appeal that it did not make to the district court. First, relying on *State v. Fekete*, 1995-NMSC-049, ¶¶ 45-46, 120 N.M. 290, 901 P.2d 708, the State contends that Defendant's statement to Ms. Alvarez, "[t]he meth that's on me baby[,]" was admissible as a volunteered statement, even assuming there was a prior *Miranda* violation. Second, the State argues that there was no error because the methamphetamine on Defendant would have been lawfully seized anyway incident to his lawful arrest under the arrest warrant. *See State*

20

*v. Paul T.*, 1999-NMSC-037, ¶ 11, 128 N.M. 360, 993 P.2d 74 ("Under the Fourth Amendment, the police may lawfully conduct a full, warrantless search of the arrestee's person without his or her permission."). The State's waiver arguments are not persuasive.

{35}     *Fekete* is of no assistance to the State. In *Fekete*, the defendant had shot and killed a man on the street, and went back to his motel room for the night. 1995-NMSC-049, ¶¶ 8-9. Three statements made by the defendant were considered on appeal. Based on their investigation, police officers went to the defendant's motel the next day and asked if he would come to the police station and be questioned. *Id.* ¶ 11. The defendant responded that he had shot a man the night before and asked if they wanted the gun, pointed out where it was, and handed the officers extra ammunition he was carrying. *Id.* On the way to the police station, the defendant repeated twice again that he had shot a man the night before. *Id.* At the police station, the defendant signed a written waiver of his *Miranda* rights and gave a full confession. *Id.* Our Supreme Court held the defendant's first statements at the motel room were not the product of a custodial interrogation and were properly admitted into evidence. *Id.* ¶ 42. Our Supreme Court then assumed that the defendant was in custody on the way to the police station, and concluded that all of his statements, except one, were spontaneous and not in response to any questions by the police. And, the one question

21

asked was, "[W]hich one[?]" in response to the defendant's question about whether the man had lived. *Id.* ¶ 45. As to this question, our Supreme Court concluded, the error, if any, was harmless, because the defendant only repeated his earlier statements at the motel. *Id*. ¶ 46. Finally, our Supreme Court held that because the defendant made a valid voluntary, knowing, and intelligent waiver of his *Miranda* rights before giving the full confession at the police station, any error in admitting defendant's two prior statements was harmless. *Id.* ¶¶ 46, 49-51. In contrast to *Fekete*, Defendant's statement to Ms. Alvarez was simply the product of his prior *un-Mirandized* confession to Officer Apodaca that he had methamphetamine on his person. This statement and the powder taken from Defendant were subject to suppression under the fruit of the poisonous tree doctrine. *See Greene*, 1977-NMSC-111, ¶¶ 31-32. We do not further consider *Fekete.*

{36} Significantly, the State overlooks the fact that Defendant's purported "voluntary" statement was admitted into evidence only because the district court denied Defendant's motion to suppress. Defendant was left with relying on lapel cam videos which would otherwise have been suppressed to support his defense that the methamphetamine came from Ms. Alvarez. Moreover, the district court mandated that the entire videos be given to the jury. Under these circumstances, there was no waiver. *See State v. Zamarripa*, 2009-NMSC-001, ¶ 50, 145 N.M. 402, 199 P.3d 846

22

("An objection is not waived where, after it is overruled, the objecting party agrees to the introduction of statements similarly objectionable and relies on them to make its case."). *See Saynor v. Sholer*, 1967-NMSC-063, ¶ 6, 77 N.M. 579, 425 P.2d 743 ("The court having already overruled the proper [hearsay] objection . . . counsel was placed in the rather unenviable position of having to make the best of a bad situation [by relying on hearsay]. This was not a waiver[.]" (internal quotation marks and citations omitted)).

{37} The State's inevitable discovery argument also fails. As set forth above, the suspected methamphetamine seized from Defendant was combined with suspected methamphetamine seized from Ms. Alvarez into one bag at the scene by Officer Apodaca. It is therefore unknown what, specifically, was tested positive for methamphetamine by Mr. Gomez. Because of its erroneous suppression ruling, the district court never developed a record for this Court to review regarding the inevitable discovery doctrine or the officer's contamination of the seized evidence. We apply the right for any reason doctrine only if doing so "is not unfair to the appellant." *State v. Gallegos*, 2007-NMSC-007, ¶ 26, 141 N.M. 185, 152 P.3d 828; *Beggs v. City of Portales*, 2013-NMCA-068, ¶ 32, 305 P.3d 75 ("It is within this Court's discretion to affirm the district court under the 'right for any reason' doctrine, but we will not exercise such discretion if it would result in unfairness to the

23

appellant."). Under the circumstances, it is unfair to apply the doctrine here, and we decline to do so.

{38} Finally, in our determination of whether the error in admitting Defendant's statement into evidence was harmless beyond a reasonable doubt, we note that no better evidence was available to the State besides Defendant's statement—his confession—that Defendant had methamphetamine on his person, and knew it was methamphetamine. Our Supreme Court has recognized that the impact of a confession is virtually impossible for a jury to ignore:

> Confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so. A full confession in which the defendant discloses the motive for and means of the crime may tempt the jury to rely upon that evidence alone in reaching its decision. The risk that the confession is unreliable, coupled with the profound impact that the confession has upon the jury, requires a reviewing court to exercise extreme caution before determining that the admission of the confession at trial was harmless.

*State v. Alvarez-Lopez*, 2004-NMSC-030, ¶ 34, 136 N.M. 309, 98 P.3d 699 (alterations and omissions omitted) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991). *See United States v. Leon-Delfis*, 203 F.3d 103, 112 (1st Cir. 2000) ("Confessions are by nature highly probative and likely to be at the center of the jury's attention.").

{39} We reject the State's arguments of harmless error and we are otherwise unable to conclude beyond a reasonable doubt that the admission of Defendant's statement into evidence, in violation of *Miranda,* was harmless.

**CONCLUSION**

{40} We reverse Defendant's conviction and remand to the district court for a new trial. In light of our holding, we do not address Defendant's remaining arguments.

{41} **IT IS SO ORDERED.**

_____

**MICHAEL E. VIGIL, Judge**

**I CONCUR:**

_____

**TIMOTHY L. GARCIA, Judge Pro Tempore**

**J. MILES HANISEE, Judge (dissenting)**

**HANISEE, Judge (dissenting).**

{42} When a defendant is legally arrested—as is the case when an NCIC search undertaken by law enforcement officers reveals the existence of an outstanding felony arrest warrant—our precedent uniformly, plainly and consistently permits a contemporaneous search incident to arrest. It matters not that supplemental confirmation of the warrant's accuracy by APD dispatch was ongoing when Defendant was handcuffed, searched, and seated upon a curb during the remainder of the officers' on-scene investigation. Stated more simply, a legal arrest commands the constitutionality of a search incident thereto. As such, the methamphetamine found in the pill container, attached to Defendant's belt, is admissible against him at trial. Also, I would hold Defendant's constitutional rights not to have been violated when he was asked, without being first notified of his right to remain silent, whether he possessed anything on his person that officers "should know about" because such an inquiry is justified by the limited *Miranda*-excepted need to secure officer safety. Therefore, Defendant's ensuing statement notifying officers of the presence of the methamphetamine on his person is also admissible against him. I respectfully dissent.

{43} First, we have held that outstanding arrest warrants permit arrests. *See State v. Grijalva*, 1973-NMCA-061, ¶ 12, 85 N.M. 127, 509 P.2d 894 (holding that possession of an arrest warrant is not essential to the legality of an arrest based

26

thereon when the validity of the arrest warrant is not challenged). Despite the Majority's characterization of the warrant at issue to be a "possible active felony arrest warrant[,]" Majority Op. ¶ 5, our appellate courts have never held—nor should either hold—that arrest upon an NCIC-reported felony arrest warrant may only follow some secondary confirmation that the warrant is accurate or remains active. While ensuring the accuracy of known arrest warrants is laudable, it is not a constitutional mandate. I would make plain today that the initial discovery of an outstanding felony arrest warrant by use of a nationally-relied-upon database permitted Defendant's arrest.

{44} Next, searches incident to arrests are as entrenched as any exception to the otherwise applicable warrant requirement that serves generally, but not always, as the constitutional prequel to police looking for things in private places such as pill boxes attached to belt loops. *State v. Paananen*, 2015-NMSC-031, ¶ 29, 357 P.3d 958 ("One of the most firmly established exceptions to the warrant requirement is the right on the part of the government, always recognized under English and American law, to search the person of the accused when legally arrested." (internal quotation marks and citation omitted)); *State v. Weidner*, 2007-NMCA-063, ¶ 23, 141 N.M. 582, 158 P.3d 1025 (stating that the search incident to arrest exception requires the state to prove "that the search occurs as a contemporaneous incident to the lawful arrest of the

defendant and is confined to the area within the defendant's immediate control" (internal quotation marks and citation omitted)). Coupled with Defendant's legal arrest, the accompanying search of his person and pockets corrects the Majority's conclusion that the methamphetamine Defendant possessed cannot be used against him at trial.

{45} The more constitutionally intriguing issue, one I suggest our Supreme Court take up, is the propriety of the un-*Mirandized* question asked of Defendant just before the constitutionally compliant search incident to his arrest. While the Majority's disallowance of the wording employed by the arresting officer finds some support in other jurisdictions, *see* Majority Op. ¶¶ 20, 27-28, I would hold differently. *Quarles* held that "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." 467 U.S. at 657. In appropriate circumstances, *Quarles* has been interpreted to allow questions such as that asked here. *See United States v. Newsome*, 475 F.3d 1221, 1225 (11th Cir. 2007) (finding no problem with the officer's broadly phrased question, "Is there anything or anyone in the room that I should know about?" (internal quotation marks omitted)); *United States v. Luker*, 395 F.3d 830, 832 (8th Cir. 2005) (upholding the propriety of an officer's question regarding the presence of anything in a defendant's vehicle "that shouldn't be there

28

or that [officers] should know about"); *United States v. Gorrell*, 360 F. Supp.2d 48, 53 (D.D.C. 2004) (upholding constitutionality of officer question, asked when placing the defendant under arrest, regarding whether there was anything "she should know about[?]"). It is my view that here, given that officers had received a report and confirmed the possibility that Defendant and a person with him were engaged in criminal activity, and had learned from NCIC of the existing felony arrest warrant for Defendant, that the question asked of Defendant was constitutionally proper. I also note the question was asked in conjunction with the searching officer donning gloves as one precaution against the possibility of sharp objects such as needles. It seems to me that the instant circumstance fits neatly within the exception to the *Miranda* requirement drawn by *Quarles* and applied by the cases interpreting it. As such, Defendant's responsive statement, like the methamphetamine found in the search itself, is admissible against him at trial.

{46}    The Majority's holding fails to reiterate the well-established constitutional propriety of the straightforward search incident to arrest that resulted in the seizure of methamphetamine from Defendant. More regrettably, it unnecessarily reduces the day-to-day safety of law enforcement officers by disallowing one simple, safety-geared inquiry of defendants that are possibly armed, possibly in possession of hazardous paraphernalia associated with drug use, or that otherwise may pose some

29

unknown yet avoidable threat to officers. I view *Quarles* to permit officers to seek such limited assurance without first providing *Miranda* warnings. I would affirm the district court's denial of Defendant's motion to suppress.

_____

**J. MILES HANISEE, Judge**